# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. _1:20-mj-04258-Reid_____

**IN RE SEALED COMPLAINT**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?     __ Yes  X  No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  __ Yes  X  No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?    __ Yes  X  No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:  _s/Amanda Perwin_____
Amanda Perwin
Assistant United States Attorney
Southern District of Florida
Florida Bar No. 46814
99 Northeast 4th Street, 4th Floor
Miami, Florida 33132-2111
Telephone: 305-961-9061
E-mail: Amanda.Perwin@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| DAVID C. COGGINS, | ) Case No. 1:20-mj-04258-Reid |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of December 31, 2019 through June 26, 2020 in the county of Miami-Dade in the Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5 | Securities Fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Keith C. Nusbaum, United States Postal Inspector
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date: December 29, 2020

*Judge's signature*

City and state: Miami, Florida    Hon. Lisette M. Reid, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Keith C. Nusbaum, being first duly sworn, state:

## AGENT BACKGROUND AND INTRODUCTION

1. I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS") assigned to the USPIS's DOJ Fraud Team. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7); that is, I am an officer of the United States who is empowered to conduct investigations and to make arrests. I have been a United States Postal Inspector since February 2016 and completed 12 weeks of basic investigative training in Potomac, Maryland, which included various aspects of federal law enforcement including the investigation of mail and wire fraud. I was previously assigned to the Washington Division Fraud Team working out of the Columbia, Maryland office of USPIS. My primary responsibilities included investigating mail fraud, wire fraud, bank fraud, work-at-home schemes, charity fraud, credit card fraud, investment fraud, financial elder abuse, lottery fraud, and telemarketing fraud. As a member of the USPIS's DOJ Fraud Team, my responsibilities include the investigation of mail fraud, wire fraud, bank fraud, and securities fraud.

2. This affidavit is made in support of a criminal complaint charging DAVID C COGGINS ("COGGINS") with violations of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Part 240.10b-5 (Securities Fraud).

3. This affidavit is based on my personal investigation and investigation by others, including federal law enforcement officials whom I know to be reliable and trustworthy. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means. This affidavit does not include

every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## Overview of the Scheme

4. The United States is investigating an investment fraud scheme in which COGGINS made false statements and provided fake documents, including an audit report, to Investor A. COGGINS did so knowingly to induce Investor A into providing $200,000 in exchange for a limited partnership in a fund managed exclusively by COGGINS. COGGINS did not invest the funds as agreed, misappropriated a portion of the funds, and has refused to return the remaining funds to Investor A.

## Relevant Parties

5. COGGINS is 42 years old and a resident of Miami, Florida. He is also the founder of Company A and the Fund, as described below.

6. Company A is a Florida limited liability company formed on or about November 4, 2014, with its principal place of business in Miami, Florida. It is the manager and investment adviser of the Fund. COGGINS has listed himself as the sole officer and owner of Company A on annual reports filed with the Florida Secretary of State's Office since October 26, 2017.

7. Company B is a Delaware limited partnership formed on or about January 2, 2015, with its principal place of business in Miami, Florida. It is a pooled investment vehicle and its assets are managed by Company A (i.e., COGGINS). COGGINS sold limited partnership interests in Company B to investors such as Investor A. COGGINS is the General Partner of Company B.

8. Company C is a Delaware limited partnership formed on or about November 19, 2019, with its principal place of business in Miami, Florida. Over time, COGGINS began directing investments under accounts and through investment documents in the name of Company C.

COGGINS sometimes used Company B and Company C interchangeably when trying to sell limited partnership interests to investors. COGGINS is the General Partner of Company C.

9. Company B and Company C are referred to collectively herein as "the Fund."

10. Investor A is a foreign national who invested in the Fund in 2020.

## Purpose of the Scheme and Artifice

11. The purpose of the scheme and artifice was for COGGINS to: (a) misappropriate investor funds for his personal purposes by transferring money from the Fund's brokerage account to a non-brokerage bank account in excess of any agreed upon management or performance fees; and (b) conceal from investors the Fund's performance losses and his misappropriation of Fund assets to avoid detection and further his unjust enrichment.

## The Scheme and Artifice

### I. Background

12. COGGINS started Company A in or around 2014 with Co-Founder A and Co-Founder B. They started the Fund in or around early 2015. Together they marketed the Fund to friends and business associates as an algorithmic trading strategy.

13. Co-Founder A and Co-Founder B resigned from Company A and the Fund in or around late 2016. COGGINS went on to operate Company A and to manage the Fund entirely on his own.[1]

---

[1] Although Co-Founders A and B resigned in 2016, they were not removed from all company documents and accounts. For example, they remained listed with COGGINS as authorized signatories on a Company A bank account from the time the account was opened in 2014 through at least September 2020. Banking activity and the listing of a prior residential address associated with COGGINS on a March 2020 bank statement suggest COGGINS exclusively operated the businesses following the resignation of Co-Founders A and B.

3

14. COGGINS continued to solicit investors to the Fund. He did so by contacting potential investors through his network of current investors, friends, family, and former business associates. He also provided information about the Fund's performance through Company A's public website on the Internet, which is a means and instrumentality of interstate commerce.

15. COGGINS also marketed the Fund through Hedge Fund Data Service A, which claimed to be able to provide information about the Fund to tens of thousands of accredited investors.

16. COGGINS offered, and sold, limited partnership interests in the Fund, which were "securities" as defined in Title 15, United States Code, Section 78c(a)(10). A limited partnership interest was documented through a subscription agreement, limited partnership agreement, and other investor materials that COGGINS emailed to investors or uploaded through an online document-sharing application. These materials described the Fund's fees, management structure, purpose, and general operations. Management fees were set, at most, to be 2% of the investor's capital account per year with performance fees capped at 20% of an investor's net profits each year. Most investors were told management fees would be capped annually at only 1% of their capital account with performance fees capped at 10% of net profits.

17. From the Fund's inception in or around 2015 through in or around February 2020, COGGINS obtained from at least ten investors approximately $1,600,000 through the sale of limited partnerships in the Fund.

## II. COGGINS Defrauded Investor A By Making False Statements and Providing Fake Documents

18. Investor A was looking to diversify his investments when he first encountered COGGINS. Investor A discovered Company A and the Fund by visiting the Company A website

4

in late December 2019, when Investor A was in Miami, Florida. Investor A sent an email to the address listed on the Company A website requesting information about the Fund.

19. On or about December 31, 2019, COGGINS, identifying himself as "Investor Relations," replied to Investor A through a Company A email account. At the time of the email, COGGINS appears to have been the only employee of Company A or the Fund and the only individual using the Company A email addresses. The December 31 email included a "performance sheet" for November 2019 that showed the Fund's 2019 year-to-date earnings to be 21.9% and positive annual earnings for each year from 2016 through 2019.

20. On or about January 1, 2020, Investor A replied to "Investor Relations" and asked Company A to provide (a) the value of the current assets under management ("AUM") and (b) a copy of the Fund's prospectus and audit report. The same day, "Investor Relations" responded that it would send a copy of the documents and noted "AUM is a little over $100." Investor A understood this to mean that the Fund had over $100 million in AUM.

21. On or about January 13, 2020, "David C. Coggins, Phd CEO [Company A]" [sic] responded to Investor A from the "Investor Relations" email account.[2] Investor A and COGGINS had phone conversations and continued to exchange emails through the "Investor Relations" email account. At no other time did Investor A communicate with any other individual who claimed to represent Company A.

---

[2] Notably, the Private Offering Memorandum that COGGINS provided to Investor A does not include a Ph.D. among COGGINS' many alleged accomplishments. COGGINS is listed to only hold a Master's Degree in Business Administration. COGGINS was also the only individual identified as a manager or representative of Company A or the Fund in this offering memorandum. By contrast, an investor deck that COGGINS later provided to Investor A notes that COGGINS had a Ph.D. in Behavioral Finance from a Business School in Spain and that Company A employed four individuals including COGGINS. I interviewed one of the listed "employees" who indicated that he was never employed by the Fund or Company A.

5

22. On or about January 8, 2020, COGGINS sent Investor A an email showing that Company B had been awarded "#1 Top Performing Hedge Fund Equity Market Neutral – Past Three Years." This award was purportedly granted by Hedge Fund Data Service A based on financial performance as reported to it by COGGINS and Company A.

23. On or about January 16, 2020, COGGINS sent through the "Investor Relations" email account various investor materials including a subscription agreement and limited partnership agreement. COGGINS noted in the email, "[t]he fees for Share Class A is 1%[management]/10%[performance]." The limited partnership agreement for the Fund stated that its purpose "is to serve as a fund through which the assets of its Partners will be utilized to invest, hold, and trade in securities and other financial instruments and rights and options relating thereto." The agreement does not state that funds may be used to pay returns to other investors or for personal compensation to COGGINS in excess of any agreed-to fees (1% and 10% of the Investor A's annual holdings and net profits for respective management and performance fees).

24. Investor A requested an audit report for the Fund on at least three separate occasions from January 1, 2020, through January 31, 2020.

25. On or about January 22, 2020, Investor A and COGGINS discussed the regulatory implications of the Fund having over $100 million AUM. Investor A wrote, "I fully understand the 13F issue – as you mentioned the fund was above 100M I though[t] it would be publicly available." COGGINS had explained that he anticipated that he would begin having to publish their positions "at the beginning of the second half of 2020" because of a Securities and Exchange Commission ("SEC") requirement that requires public filings (Form 13F) for investment advisers who manage over $100 million in assets. In fact, the total AUM for the Fund had never been more than approximately $2 million.

26. On or about February 2, 2020, COGGINS emailed Investor A a fake and fraudulent "2018 audit report" for the Fund. The audit report and opinion letter were allegedly prepared by an audit firm in Miami, Florida. Records show this firm did not exist at its stated address, and a phone number listed for this firm was found to be associated with COGGINS. The audit report listed $52,904,796 in total assets for the Fund as of December 31, 2018. In reality, the Fund's primary brokerage account held less than approximately $1.4 million as of that date.

27. The statements that COGGINS made to Investor A about the Fund's successful performance, the existence of an independent audit report, and the amount of assets under management, were important and material to Investor A. Having received these (false) assurances from COGGINS, Investor A decided to invest in the Fund.

28. On or about February 3, 2020, Investor A sent signed copies of a subscription agreement for a $200,000 investment in the Fund and a Founders Share Class Addendum to COGGINS.

29. On or about February 7, 2020, Investor A sent $200,000 by wire transfer from his bank to a bank account in the name of the Fund. Investor A expected to receive a limited partnership interest in the Fund in exchange for his investment.

30. Company A transferred $199,500 of Investor A's money from the Fund's bank account to its brokerage account on or about February 12, 2020. The brokerage account's monthly beginning balance prior to this transfer was only $17.32. There were no deposits into the brokerage account from other investors from on or about February 12 through on or about April 30, 2020.[3]

---

[3] There was only one additional deposit into the brokerage account, occurring on or about February 25, 2020. On the same date that COGGINS transferred $9,100 of Investor A's money from the brokerage account to the Company A bank account, $8,500 was transferred from the Company A bank account back to the brokerage account. Other than this deposit, there were no other deposits into the brokerage account between February 1 and April 30, 2020.

7

31. During that same period, COGGINS transferred approximately $44,200 from the brokerage account to Company A's bank account. Most of this money came from Investor A's deposit. Investor A expected COGGINS to invest his money according to the terms of the agreement, not divert it for other purposes. The amount COGGINS transferred to the Company A account exceeded a 1% management fee that Company A may otherwise have been entitled to under the terms of the limited partnership agreement.

32. The net asset value of the assets in the brokerage account on or about April 30, 2020, was approximately $96,621. Nearly half of Investor A's original investment was lost due to poor performance, fees, and the transfer to the Company A bank account.

33. On or about April 30, 2020, Investor A requested a copy of his fully executed investment documents and a quarterly statement of the Fund's monthly performance.

34. On or about May 15, 2020, COGGINS sent Investor A an email with executed investment documents that were purported to have been signed by Investor A. Investor A did not immediately review each page of the attached documents. COGGINS still had not provided a statement of the Fund's first quarter performance.

35. On or about June 20, 2020, Investor A expressed concern to COGGINS that he had not been provided any statements of the Fund's performance and still had not received a physical copy of the executed investment documents.

36. On or about June 20, 2020, Investor A scrutinized the executed investment documents that COGGINS emailed to him on or about May 15, 2020. Investor A had concerns that not all the documents that COGGINS provided to him were the same as the documents Investor A signed and provided to COGGINS. Investor A believed his signature had been forged on some of the pages.

37. On or about June 26, 2020, Investor A confronted COGGINS about the suspected forgeries. COGGINS denied forging the documents. Investor A also demanded the immediate return of his investment. COGGINS stopped responding to Investor A and has not returned any portion of Investor A's $200,000 investment.

38. COGGINS used the Company A bank account that received a portion of Investor A's investment for both business and personal expenses. For example, COGGINS paid approximately $49,000 in payments to an attorney who represents the Fund in a private shareholder action. Personal expenses were also debited from the account, including transfers to a woman believed to be COGGINS' girlfriend, as well as payments to restaurants, grocery, pet, and department stores. The month-end balances for this account were negative in all but one month during this period,[4] showing Company A and COGGINS relied on syphoning money from the Fund's brokerage account to meet their expenses.

## Conclusion

39. Based on my training and experience, and the information provided in this affidavit, I respectfully submit that there is probable cause to believe that from on or about December 31, 2019, through on or about June 26, 2020, in the Southern District of Florida, and elsewhere, the defendant, DAVID C COGGINS, did unlawfully, willfully and knowingly, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security, in contravention of Rule 10b-5 and Rule 10b5-1 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission (codified in Title 17, Code

---

[4] The Company A bank account had a positive month-end balance of approximately $241 in or about April 2020.

9

of Federal Regulations, Parts 240.10b-5 and 240.10b5-1), and did (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading; and (c) engage in acts, practices and a course of business, which would and did operate as a fraud and deceit upon prospective investors in connection with the purchase of a security, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17 Code of Federal Regulations, Part 240.10b-5.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Keith C. Nusbaum
United States Postal Inspector

Attested to by the Applicant in accordance with the requirements of
Fed. R. Crim. P. 4.1 by ___Face Time___ this ____ day of December 2020.

_____
HONORABLE LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA