UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 21-CR-20105-RNS

**UNITED STATES OF AMERICA**

vs.

**DAVID C. COGGINS,**

      **Defendant.**
_____/

## FACTUAL BASIS FOR GUILTY PLEA

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt:

1. David C. Coggins, ("COGGINS" or the "Defendant"), 42 years old and a resident of Miami, Florida, is the founder of Company A and the Fund.

2. Company A is a Florida limited liability company formed on or about November 4, 2014, with its principal place of business in Miami, Florida. It is the manager and investment adviser of the Fund. COGGINS has been the sole officer since late 2016.

3. Company B is a Delaware limited partnership formed on or about January 2, 2015, with its principal place of business in Miami, Florida. It is a pooled investment vehicle and its assets are managed by Company A and COGGINS. COGGINS, the General Partner of Company B, sold limited partnership interests in Company B to investors such as Investor A.

4. Company C is a Delaware limited partnership formed on or about November 19, 2019, with its principal place of business in Miami, Florida. Over time, COGGINS began directing investments under accounts and through investment documents in the name of Company C.

COGGINS sometimes used Company B and Company C interchangeably when trying to sell limited partnership interests to investors. COGGINS is the General Partner of Company C.

5. Company B and Company C are referred to collectively herein as "the Fund."

6. Investor A is a foreign national who invested in the Fund in 2020.

7. COGGINS started Company A in or around 2014 with Co-Founder A and Co-Founder B. They started the Fund in or around early 2015. Together they marketed the Fund to friends and business associates as an algorithmic trading strategy.

8. Co-Founder A and Co-Founder B resigned from Company A and the Fund in or around late 2016. COGGINS went on to operate Company A and to manage the Fund entirely on his own.

9. COGGINS continued to solicit investors to the Fund. He did so by contacting potential investors through his network of current investors, friends, family, and former business associates. He also provided information about the Fund's performance through Company A's public website on the Internet, which is a means and instrumentality of interstate commerce.

10. COGGINS offered, and sold, limited partnership interests in the Fund, which were "securities" as defined in Title 15, United States Code, Section 78c(a)(10). A limited partnership interest was documented through a subscription agreement, limited partnership agreement, and other investor materials that COGGINS emailed to investors or uploaded through an online document-sharing application. These materials described the Fund's fees, management structure, purpose, and general operations. Management fees were set, at most, to be 2% of the investor's capital account per year with performance fees capped at 20% of an investor's net profits each year. Most investors were told management fees would be capped annually at only 1% of their capital account with performance fees capped at 10% of net profits.

11. From the Fund's inception in or around 2015 through in or around February 2020, COGGINS obtained approximately $1,600,000 through the sale of limited partnerships in the Fund.

12. Investor A sent an email in late December 2019 to the address listed on the Company A website requesting information about the Fund.

13. On or about December 31, 2019, COGGINS, identifying himself as "Investor Relations," replied to Investor A through a Company A email account. At the time of the email, COGGINS was the only employee of Company A or the Fund and the only individual using the Company A email addresses.

14. The December 31 email included a "performance sheet" for November 2019 that falsely showed the Fund's 2019 year-to-date earnings to be 21.9% and positive annual earnings for each year from 2016 through 2019.

15. On or about January 1, 2020, Investor A replied to "Investor Relations" and asked Company A to provide (a) the value of the current assets under management ("AUM") and (b) a copy of the Fund's prospectus and audit report. The same day, COGGINS responded that he would send a copy of the documents and noted "AUM is a little over $100," which COGGINS intended to mean, $100 million.

16. On or about January 8, 2020, COGGINS sent Investor A an email showing that Company B had been awarded "#1 Top Performing Hedge Fund Equity Market Neutral – Past Three Years." This award was granted by Hedge Fund Data Service A based on fake financial performance reported to it by COGGINS.

17. On or about January 16, 2020, COGGINS sent Investor A various investor materials including a subscription agreement and limited partnership agreement. COGGINS noted

3

in the email, "[t]he fees for Share Class A is 1%[management]/10%[performance]." The limited partnership agreement for the Fund stated that its purpose "is to serve as a fund through which the assets of its Partners will be utilized to invest, hold, and trade in securities and other financial instruments and rights and options relating thereto." The agreement does not state that funds may be used to pay returns to other investors or for personal compensation to COGGINS in excess of any agreed-to fees (1% and 10% of the Investor A's annual holdings and net profits for respective management and performance fees).

18. On or about January 22, 2020, Investor A and COGGINS discussed the regulatory implications of the Fund having over $100 million AUM. COGGINS knowingly, and falsely, led Investor A to believe the Fund held more than $100 million in assets. In fact, the total AUM for the Fund had never been more than approximately $2 million.

19. On or about February 2, 2020, COGGINS emailed Investor A a fake and fraudulent "2018 audit report" for the Fund. COGGINS created the audit report and opinion letter and placed them on letterhead for an audit firm in Miami, Florida, that did not actually exist. The audit report listed $52,904,796 in total assets for the Fund as of December 31, 2018. In reality, the Fund's primary brokerage account held less than approximately $1.4 million as of that date.

20. Statements that COGGINS made to Investor A about the Fund's successful performance, the existence of an independent audit report, and the amount of assets under management were false.

21. On or about February 3, 2020, Investor A sent signed copies of a subscription agreement for a $200,000 investment in the Fund and a Founders Share Class Addendum to COGGINS.

22. On or about February 7, 2020, Investor A sent $200,000 by wire transfer from his bank to a bank account in the name of the Fund. COGGINS led Investor A to believe Investor A would receive a limited partnership interest in the Fund in exchange for his investment.

23. COGGINS transferred $199,500 of Investor A's money from the Fund's bank account to its brokerage account on or about February 12, 2020. The brokerage account's monthly beginning balance prior to this transfer was only $17.32. From February 12 through December 31, 2020, the value in the brokerage account dwindled to $49.74. Besides the deposit of Investor A's money there was only one other deposit into the brokerage account during this period – in the amount of $13,700 from the Company A bank account.

24. By June 2020, Investor A requested COGGINS return his investment. COGGINS stopped responding to Investor A and did not return any portion of Investor A's $200,000 investment. On August 12, 2020, COGGINS drained most of the remaining funds in the brokerage account by transferring them to the Company A bank account that he accessed for both business and personal expenses.

25. Investor A's original investment was lost due to poor performance, fees, and transfers to the Company A bank account far in excess of what COGGINS or Company A was entitled to under the terms of the agreement.

26. From on or about September 2016 through on or about December 2020, COGGINS misappropriated investor funds for his personal purposes and concealed from investors the Fund's performance losses and his misappropriation of Fund assets to avoid detection and further his unjust enrichment. Specifically, COGGINS did not tell the investors that the net asset value of the Fund was nearly zero in 2020. The loss to investors who were unable to recover their investments as a result of the scheme is $1,305,000.

27. The Defendant's actions in furtherance of the offense charged, including but not limited to the acts described above, were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or other innocent reason. The Defendant's actions were within the Southern District of Florida and in other Districts. Finally, the foregoing is a summary of the principal facts that constitute the legal elements of the offense of securities fraud. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine the Defendant's sentence under the Sentencing Guidelines. The Defendant acknowledges that the foregoing does not describe all of the Defendant's conduct relating to the offense charged, nor does it identify all the persons with whom the Defendant may have engaged in illegal activities.

DANIEL KAHN, ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

Date: 2/25/2021     By: _____
EMILY SCRUGGS
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

Date: 2/25/2021     By: _____
CHRISTIAN SCOTT DUNHAM
ATTORNEY FOR DEFENDANT

Date: 2/25/2021     By: _____
DAVID C. COGGINS
DEFENDANT