UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-20105-CR-SCOLA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DAVID C. COGGINS,

        Defendant.

_____/

## **DEFENDANT'S SENTENCING MEMORANDUM**

From the outside, the Coggins family of 2014 appears to be a success. David Coggins has just graduated from business school; him and his wife Jessica live in Pinecrest, Florida, and are raising two young children and an infant son. After a short but successful career as a private banker, David is about to start a hedge fund with two of his business school professors.

Just two years later, David is alone and overwhelmed. His wife's multiple arrests for theft and burglary has his marriage on the rocks and the departure of his older, more experienced business partners leave him running a hedge fund with no prior experience and by himself. He is in over his head. The snowball effect of the partners' departures, his soon to be ex-wife's crimes, deep trading losses, and his own health problems leave the hedge fund in dire straits. Instead of disclosing the hedge fund's losses and winding the fund down, Mr. Coggins lies to investors and embarks

on a costly charade that now ends in federal court. Bad partners and bad health led to bad decisions, but Mr. Coggins is not a bad person.

As explained below, a variance is appropriate in Mr. Coggins case. The defense respectfully requests a downward variance from the advisory guidelines in the form of a split sentence of imprisonment for 12 months and supervised release for a period of 36 months with the first 12 months of supervised release to be served in home confinement.

## I. Bad Partners.

In late 2014, shortly after earning his MBA, David Coggins is presented with the opportunity of a lifetime. Dr. Alok Kumar, a named professor of finance at the University of Miami Herbert Business School, offers David the chance to join with him and Dr. Jawad Addoum, another professor at the University of Miami, to start a new hedge fund. Dr. Addoum would run the portfolio using Dr. Kumar's proprietary trading algorithms, and David would run the back-office operations. David accepts without hesitation.

Little did he know that at the same time he thought his business dreams were finally being realized, his wife Jessica's multi-year struggle with kleptomania was just beginning. In fact, on July 29, 2014, just a few weeks before David graduates from business school at the University of Miami, Jessica is arrested for shoplifting cosmetics from a Sephora at the Dadeland Mall. She hides the arrest from David for over a year.

### A. The Professors.

Dr. Alok Kumar, the Gabelli Asset Management Professor of Finance at the University of Miami, is well known in the field of behavioral finance. From 2014 to 2020, he was the Chair of the Finance Department at the University of Miami. He has four master's degrees and a Ph.D. in economics. When he offered Mr. Coggins the chance to join him in starting a hedge fund, there was no question that David would say yes. As the Chief Investment Officer, Dr. Kumar oversaw the fund's algorithmic trading strategy. Algorithmic trading relies on computer programs to electronically initiate trades faster than human brokers.

Dr. Jawad Addoum, now of Cornell University, was formerly an Assistant Professor of Finance at the University of Miami. Dr. Addoum was the fund's portfolio manager and executed the trading strategies devised by Dr. Kumar.

The fund began operations in 2015. Dr. Kumar and Dr. Addoum met with many of the fund's initial investors to raise money, including some of the named victims in this case such as A.C., M.F., and T.C. *See* PSI ¶ 33.

The departure of the two professors in late 2016 crippled the hedge fund. Dr. Kumar resigned from the fund in November 2016. A month later, Dr. Addoum resigned and left to take a position at Cornell University. Despite their expertise in behavioral finance, empirical asset pricing, and computational economics, trading losses while the two professors oversaw the portfolio in 2015-2016 totaled over $375,000. Instead of finding suitable experts to replace the two professors, he chose to continue operating the fund. Without access to Dr. Kumar's algorithmic trading

strategies and with no experience as a trader, the fund's trading and market losses deepened over the next four years. Mr. Coggins hid these losses from investors.

**B. Jessica.**

Jessica Shere and David Coggins were married in 2004. Starting in 2014, Ms. Shere began stealing. First, she was arrested for shoplifting from a cosmetics store in the Dadeland Mall in July 2014.[1] Ms. Shere was offered and completed a pretrial diversion program. She never told David about the arrest.

A year later, in August 2015, Ms. Shere was again arrested at the Dadeland Mall for stealing from a Saks Fifth Avenue.[2] Because she was arrested with the couple's three children, David was asked to come pick them up. It was then that police told Mr. Coggins about his wife's prior arrest. Ms. Shere was charged with grand theft in the third degree; the state took no action.

A few months later, on November 23, 2015, David was called to a Target in Dadeland. Jessica had been arrested once more. She was again charged with grand theft in the third degree. Between Jessica's arrest at Target and her nolo contendere plea in May 2017,[3] Jessica would be separately investigated and arrested for a string of burglaries in the couple's Pinecrest neighborhood. Shortly after her arrest for the Pinecrest burglaries in August 2016, Jessica was ordered by the court to attend a

---

[1] Miami Dade County Criminal Court Case No. B-14-031124.

[2] Miami Dade County Criminal Court Case No. F-15-017982.

[3] Miami Dade County Criminal Court Case No. F-15-023164 at D.E. 94 (Finding of Guilt). Jessica entered a nolo contendere plea, was found guilty, had the finding of guilt stayed, and was placed on probation.

residential inpatient treatment program at Agape Network in Miami. David was left at home to take care of the couple's three young children. Two months into Jessica's treatment, Dr. Kumar and Dr. Addoum resigned from the fund. Jessica returned from Agape in December 2016 and was placed on a location monitor.

Jessica's August 2016 arrest for the burglaries was a low point for David. The arrest was covered by the Miami Herald and picked up by local news stations.[4] David was embarrassed but remained supportive of his wife. The couple's neighbors, however, were less kind. The Coggins' were subjected to hate mail from irate neighbors who threatened Jessica and demanded that the family move out of south Miami. Jessica pleaded no contest in May 2017 to three counts of burglary and three counts of grand theft in the third degree.[5] The court placed Jessica on community control (home confinement) followed by eight years of probation. She remained on community control until September 2017.

In May 2018, after Jessica's three arrests, nine months on home confinement, three months of inpatient treatment, over two years of court hearings, and eighteen months after the departure of David's two business partners, the couple agreed to separate. The next fifteen months remained tumultuous. In October 2018, David

---

[4] Charles Rabin, *Murph the Surf she ain't. Bungling burglar left cold beer behind*, Miami Herald, Aug. 30, 2016, available at:
https://www.miamiherald.com/news/local/crime/article98798762.html (last accessed May 2, 2021); Ted Scouten, *Police: Pinecrest Resident Burglarized Neighbors' Homes*, CBS Miami, Aug. 30, 2016, available at:
https://miami.cbslocal.com/2016/08/30/police-pinecrest-resident-burglarized-neighbors-homes/ (last accessed May 2, 2021).

[5] Miami Dade County Criminal Court Case No. F-16-017864 at D.E. 75 (Finding of Guilt). Jessica's probation was terminated early in March 2019.

obtained a temporary restraining order after a domestic violence incident at the couple's home. David's health began to decline during the spring of 2019 and he went to an oncologist after noticing lumps on his neck and head. The couple's divorce was finalized in August 2019.

## II. Bad Health.

Mr. Coggins' history of skin cancer, anxiety, depression, hypertension, and degenerative spinal disc disease are relevant for two reasons. First, while Mr. Coggins' poor health in 2019 and 2020 does not excuse his criminal behavior, it does—like his marital problems—put his bad decisionmaking into context. It is extenuating. Not only was he professionally in over his head, but his personal life and later his health were also in rapid decline. Second, Mr. Coggins' medical conditions are mitigating. A long prison sentence without access to consistent mental health care and cancer monitoring would be detrimental to Mr. Coggins' health. His history of skin cancer and hypertension also put him at risk of more severe disease should he contract COVID-19. And while vaccines are highly protective and "breakthrough" cases rare, the close quarters of a prison environment and the low vaccine participation rate by both BOP staff and inmates, increases the risk of new infections and, in the already

vaccinated, may still result in re-infection among those with weak immune conditions or other underlying health conditions.[6]

### A. Cancer.

In January 2019, David noticed a lump on the back of his head. After consulting with a dermatologist, Mr. Coggins underwent two rounds of Mohs surgery to treat what was ultimately diagnosed as skin cancer. Mohs surgery involves repeated removal and interpretation of skin tissue until the cancerous cells can no longer be detected by microscope. Dr. Alyssa Herman, the surgeon who conducted the Mohs procedure, was concerned that the cancer may have spread to other parts of his neck, including his lymph nodes. She referred David to another head and neck surgeon, Dr. David Arnold, at the University of Miami. After conducting a CT scan of David's neck, Dr. Arnold recommended further surgery. A cancer diagnosis at age 40 was shocking and further isolated David from his friends and family.

### B. Anxiety and Depression.

Mr. Coggins dealt with his cancer diagnosis poorly. He became depressed and postponed surgery with Dr. Arnold multiple times. He finally sought mental health treatment with a psychologist, Dr. Alina Lopez-Gottardi. Her letter to the Court

---

[6] *See* Nicole Lewis, *US prison guards refusing vaccine despite COVID-19 outbreaks*, AP, Mar. 15, 2021, available at: https://apnews.com/article/us-prison-guards-refuse-vaccine-despite-covid-19-outbreaks-522775575fc815ee2354e97c3428dce0 (last accessed May 4, 2021); Lena H. Sun, *CDC ramps up scrutiny of rare post-vaccination 'breakthrough infections'*, Washington Post, Apr. 9, 2021, available at: https://www.washingtonpost.com/health/2021/04/09/do-people-get-covid-after-being-vaccinated/ (last accessed May 4, 2021).

articulates how the confluence of Jessica's legal issues, his health issues, and the divorce contributed to Mr. Coggins' poor decisionmaking.

Dr. Londono, a psychiatrist who Mr. Coggins began seeing in early 2013, echoes many of the conclusions reached by Dr. Gottardi. Both doctors agree that Mr. Coggins' anxiety and depression predated his arrest and his crimes. In their view, the catalyst for Mr. Coggins' anxiety and depression was his wife's crimes. It was those crimes that destabilized the family, led, in part, to the family's financial hardship, and ultimately contributed to Mr. Coggins' criminal decisions.

### C. Hypertension.

David was diagnosed with hypertension in 2005. After experiencing chest tightness and going to South Miami Hospital for overnight observation in February 2020, David began regularly seeing a cardiologist. Dr. Jorge Cuello confirmed David's hypertension diagnosis and discovered a slight systolic heart murmur (grade 2/6). David continues to take amlodipine for hypertension and was recently prescribed metoprolol, a beta blocker.

### D. Degenerative Disc Disease.

David was recently diagnosed with degenerative disc disease. After experiencing significant back pain, David underwent a cervical MRI in April 2021. The MRI revealed moderate degenerative disc disease at C2-3, C5-6, and C6-7; bone

spurs at C5-6 and C6-7; mild to moderate central canal stenosis[7] at C5-6; moderate central canal stenosis at C6-7; and severe right and mild left neural foraminal stenosis at C5-C6.  David is currently taking prednisone for the pain and will likely require surgery in the near term.

## III.  Bad Decisions.

At the inception of the fund, Mr. Coggins believed that he would never have to worry about money again; he believed in the financial expertise of his professors. Instead, the fund became a financial albatross. Mr. Coggins' expenses grew as the years went on: legal bills from his wife's misconduct; costs associated with his divorce; and medical bills. In turn, the lies grew as well. Misappropriating funds and stealing from investors was a short-term solution to a problem of Mr. Coggins' own making. Maintaining the façade of a successful hedge fund required deceiving investors but it also required a level of self-deception that only someone who felt that they were losing their family, their mind, and their physical health would ever attempt. Of the approximately $1,305,000 in losses, approximately $450,000 was misappropriated by Mr. Coggins and used for improper business and personal expenses. The remaining losses, undisclosed to investors, were from trading and totaled over $725,000.

---

[7] Stenosis is the narrowing of space. Central canal stenosis is the narrowing of the passageway housing the spinal cord. Neural foraminal stenosis is the narrowing of cervical disc space caused by enlargement of a joint in the spinal canal. The narrowing of the disc space often causes nerve compression which results in back pain.

Prior to his arrest in this case, Mr. Coggins placed $50,000 in a trust account managed by a private attorney for the express purpose of at least partially providing restitution to Investor A. *See* PSI ¶¶ 84-85.

Mr. Coggins is aware of both the related concern and self-employment restrictions recommended by U.S. Probation. But Mr. Coggins is highly educated and is planning on securing employment where he can utilize his MBA training and his Master of Science degree in finance to generate an income to both support his family and make restitution to the victims in this case.

## IV. Variance.

A downward variance is warranted in this case.

Mr. Coggins is a devoted father to his three children. Unfortunately, it was his misguided desire to maintain stability for his children amid his ex-wife's legal issues, a contentious divorce, and his own mounting health issues that motivated much of the deception and misappropriation in this case. Mr. Coggins made bad decisions in a misguided attempt to keep his life together. But an appropriate sentence is not one that prevents him from rebuilding his life. An appropriate sentence balances the seriousness of his crimes and the need for deterrence against the need to rehabilitate Mr. Coggins and provide restitution to his victims.

### A. Deterrence.

A lengthy prison sentence is not necessary to deter Mr. Coggins from engaging in criminal conduct again. Mr. Coggins has yet to be sentenced by the Court but has already incurred significant punishment. He is a felon. He will never work in the

securities industry again. His reputation as an honest professional is gone, perhaps forever. And at some point in the future, he will have to face his children and explain his misconduct.

Mr. Coggins has also accepted responsibility for his crimes. He pleaded guilty just two months after the complaint in this case was filed, saving the Government a significant amount of prosecutorial time and resources. Mr. Coggins' remorse and acceptance of responsibility was also reflected in the parallel civil enforcement case brought by the Securities and Exchange Commission. That case predates the criminal complaint and his arrest by several months. In the SEC case, Mr. Coggins did not oppose the SEC's request for a preliminary injunction, asset freeze, or any other requested emergency relief. Nor did Mr. Coggins oppose the SEC's Motion for Judgment against him.

As shown above, the circumstances that led to Mr. Coggins' criminal conduct in this case were extensive, multi-faceted, and unlikely to ever happen again. Mr. Coggins' lack of criminal history, combined with the related concern and self-employment restrictions, make it highly unlikely that he recidivates.

**B. Rehabilitation.**

As many of the letters written in support of Mr. Coggins point out, he has a long history of compassion, kindness, and prior to his involvement in the fund, professional success. Rehabilitation for Mr. Coggins will require reflection, mental health counseling, opportunities to find purpose outside of just financial success, and his family's support. Unlike many defendants, Mr. Coggins has access to excellent

mental health providers, a strong family support system, and the benefits of higher education and advanced degrees. Incarceration for 12 months will provide time for reflection and rehabilitation, while a significant period of home confinement will ensure that Mr. Coggins remains focused on getting back to being the productive member of society that he was prior to his crimes. Home confinement will also provide Mr. Coggins the ability to resume treatment with his psychologist and psychiatrist while still in a restricted and confined status. Ms. Deborah Haff, David's fiancée, is pregnant and due in early June; home confinement will also limit the time away from his soon to be newborn infant. As many of the letters in support point out, being a father is a strong part of Mr. Coggins' identity and allowing him to resume that role will improve his mental health and focus his energies on providing for his family and repaying his victims.

### C. Restitution

A downward variance will also facilitate Mr. Coggins' payment of restitution. The sooner he can utilize his extensive education in a productive manner, the sooner his victims can be made whole. While the restitution owed by Mr. Coggins is significant, it is not unmanageable. Prior to the fund, Mr. Coggins worked several commission-based jobs where his annual income regularly exceeded $200,000.[8] As stated in Mr. Rezek's letter in support of Mr. Coggins, he has a sales job waiting for him at Town Business Systems once he completes his sentence.

---

[8] The figures in PSI paragraphs 79-81 are approximate *monthly* income figures—not annual salary.

**D. Requested Sentence.**

Mr. Coggins respectfully requests the Court order and recommend the following:

(1) Imprisonment for 12 months;

(2) Supervised release for a term of 3 years, with the first 12 months to be served on home detention with allowances for employment, medical and mental health appointments, and any other activities as pre-approved by U.S. Probation;

and;

(3) Designation to either FPC Montgomery at Maxwell AFB or to FPC Pensacola.

Respectfully Submitted,

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

*s/ Andrew Jacobs*
Andrew Jacobs
Assistant Federal Public Defender
Florida Special Bar No. A5502687
150 W. Flagler St., Ste. 1700
Miami, FL 33138
Telephone (305) 530-7000
Email: Andrew_Jacobs@fd.org

13

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 11, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>*s/ Andrew Jacobs*</u>
Andrew Jacobs